STATE of Wisconsin, Plaintiff-Respondent,

v.

Jene R. BODOH, Defendant-Appellant.†

Court of Appeals

*No. 97–0495–CR. Oral argument February 12, 1998.—Decided May 13, 1998.*

(Also reported in 582 N.W.2d 440.)

†Petition to review granted.

On behalf of the defendant-appellant, there were briefs and oral argument by *Michael D. Mandelman* of Milwaukee.

On behalf of the plaintiff-respondent, there was a brief by *James E. Doyle,* attorney general, and *Gregory M. Posner-Weber,* assistant attorney general. There was oral argument by *Gregory M. Posner-Weber.*

Before Snyder, P.J., Brown and Anderson, JJ.

BROWN, J. This is a dog bite case. The twist is that this case does not come to us under the civil liability statute, § 174.02 STATS., but from a criminal judgment of conviction pursuant to § 940.24, STATS. ("Injury by negligent handling of dangerous weapon, explosives or fire."). Jene R. Bodoh was charged and convicted after his two Rottweilers escaped from a fenced enclosure in his yard and attacked a fourteen-year-old boy on a bicycle while Bodoh was out of town. Bodoh argues that the statute in question was not intended to be used in dog bite cases absent some evidence that the dog was used or was intended to be used as a dangerous weapon at the time of the injury. He claims that because the evidence shows he did not train the dogs to be dangerous weapons and did not use the dogs as dangerous weapons at the time of the occurrence, the evidence is insufficient as a matter of law. He also observes that the standard of negligence must be "negligence to a high degree." He argues that because it is obvious that he took more than normal measures to keep the dogs fenced in, and could not reasonably foresee the harm the dogs eventually caused, the evidence is insufficient as a matter of law. Because there is evidence from which a jury could find that he used the dogs as guard dogs and, therefore, intended them to be dangerous weapons, the law imposes a duty on him to handle the dogs so as not to create a substantial and unreasonable risk of death or

great bodily harm to another. The jury found him criminally negligent in that regard and we affirm.

As we wrote above, while Bodoh was out of town, his two dogs escaped from their enclosure in his yard.[1] While they were running loose, the dogs attacked a boy. The boy testified that he was pulled off his bicycle by the dogs and that they continued to attack him as he tried to run away. The boy testified that the attack lasted nearly ten minutes, until he reached the front yard of a nearby house. The homeowner heard the boy's screams and was able to scare off one dog and get the other one to retreat.

When the police arrived, they saw one dog approximately four to five feet away from the boy. One officer who was on the scene testified that the victim initially appeared to be "a clump of clothing" on the ground. Because the dog was growling as the officers approached, it was shot and killed.[2] The victim was transported to the hospital by ambulance. He testified that over 300 stitches were required to close all of the wounds inflicted by the attack.

When Bodoh returned home, he was contacted by the sheriff's department. He demonstrated the steps he had taken to restrain the dogs. He showed the deputy that he had used metal stakes to secure the bottom of the chain link fence and had placed boards and an electric wire around the base of the fence. He also told a deputy that the dogs had been restrained by choke collars attached to chains.

---

[1] It is not clear from the record whether the dogs were chained up, within a fenced-in enclosure, or both at the time they got loose.

[2] The second dog, which initially ran off, was also killed by the police.

Bodoh was charged with criminal negligence under § 940.24, STATS., and the case went to trial. After hearing extensive testimony, a jury found Bodoh guilty and he now appeals. Additional facts will be included as necessary to our discussion.

## Standard of Review

As an initial matter, the parties disagree as to the appropriate standard of review. Bodoh argues for a de novo standard of review and states that our review necessitates "[t]he application of a statute to an undisputed set of facts" which is a question of law that this court reviews without deference to the trial court. The State contends that "this appeal involves the sufficiency of the evidence to support Bodoh's conviction" and argues accordingly. Because Bodoh has raised the issue of whether the statute was properly interpreted and applied in this instance, and an analysis of that question must properly precede a consideration of the sufficiency of the evidence, we begin by reviewing that issue. Our review on this first claim is de novo. *See Graziano v. Town of Long Lake,* 191 Wis. 2d 812, 817, 530 N.W.2d 55, 57 (Ct. App. 1995).

## Physical and Temporal Proximity of the Dog Owner

Bodoh contends that it was improper to charge him with a violation of § 940.24, STATS., the "negligent handling of [a] dangerous weapon," where his dogs escaped from a contained area during his absence and injured a person. Section 940.24 provides:

**Injury by negligent handling of dangerous weapon, explosives or fire.** Whoever causes bod-

ily harm to another by the negligent operation or handling of a dangerous weapon, explosives or fire is guilty of a Class E felony.

We addressed whether a dog can be a dangerous weapon in *State v. Sinks,* 168 Wis. 2d 245, 483 N.W.2d 286 (Ct. App. 1992). We said, "[i]t is common knowledge that dogs can inflict severe injury and can . . . attack." *Id.* at 254, 483 N.W.2d at 290. We also noted in that case that "it is . . . the nature of the act which determines whether the instrumentality is a dangerous weapon." *Id.*

Bodoh acknowledges *Sinks,* but argues that it "only contemplates a situation in which the defendant issues commands to a trained dog to perpetrate" a crime. Bodoh observes that he "was nowhere near his dogs at the time of the incident and they certainly were not obeying his commands." He notes that there is no evidence about whether the dogs were trained to attack or were used or intended to be used to carry out a criminal act. Therefore, while Bodoh concedes that a dog can be a dangerous weapon for purposes of § 940.24, STATS., he asserts that the statute does not fit the facts here.

We view Bodoh's argument to be, in part, that a person's operation or handling of a dangerous weapon must be within the physical or temporal proximity of the harm caused by the weapon. The focus of Bodoh's argument is properly on the words "operation" and "handle." Bodoh contends that to be subject to either term within the statute, there must be evidence that one must have "intentionally manipulated or controlled the weapon in a criminally negligent manner, or at least acted to bring about the effect." As support, Bodoh cites law saying that a recognized dictionary may be used as a source to define a statutory term. *See*

*State v. Kastner,* 156 Wis. 2d 371, 373, 457 N.W.2d 331, 332 (Ct. App. 1990). He directs us to a recognized dictionary which defines "operation," in part, as "to run or control the functioning of: operate a machine." *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 920 (1969).[3] He cites the same dictionary as a source for the definition of "handling" which, along with other similar definitions, is "to touch, lift or turn with the hands" or "to operate with the hands: manipulate." *Id.* at 598. Bodoh apparently asserts that both of these definitions evince the necessity of physical or temporal proximity by a person toward an object.

Our analysis yields a different answer. We reject the view that the terms "operation" and "handling" both require proximal manipulation or control. To do so would render one of the words superfluous to the other. A plain reading of § 940.24, STATS., shows that the disjunctive "or" sits between the word "operation" and the word "handling." One of the maxims of statutory construction is that a law should be construed so that no term is redundant of another term. *See Chvala v. Bubolz,* 204 Wis. 2d 82, 89, 552 N.W.2d 892, 895 (Ct. App. 1996). While, as a matter of common sense, a person who "operates" a dangerous weapon usually must be physically present to do so in order to manipulate the "operation" of the weapon, the same cannot be said about the word "handle." We prefer the State's dictionary definition that "handle" includes the phrase "to have overall responsibility for supervising or directing . . . to act on or perform a required function

---

[3] We note that the cites to the 1969 version of THE AMERICAN HERITAGE DICTIONARY are taken from Bodoh's brief. Although we were unable to locate that version, the definitions in the 1992 version are substantially the same.

with regard to." WEBSTER'S NINTH NEW COLLEGIATE DIC-TIONARY 550 (1991). We also note, as has the State, that even the dictionary cited to us by Bodoh includes, among many constructions of the word "handle," the following: "to specialize in or have a responsibility for." THE AMERICAN HERITAGE DICTIONARY, *supra* at 920. We conclude that physical or temporal proximity is not a prerequisite to the statutory requirement that the defendant's criminally negligent handling of a dangerous weapon cause the necessary injury. Rather, once it is determined that a person intends a dog to be a dangerous weapon, the person has the responsibility to properly supervise the weapon. If the owner exhibits a high degree of negligence in supervising the weapon, and the weapon injures someone as a result of that negligence, there is exposure to criminal liability. Under this scenario, an owner of a dog intended to be used as a dangerous weapon does not necessarily have to be present when the harm occurs and does not have to actively manipulate the dog in such a manner as to create an unreasonable risk of harm to another person in order for criminal liability to ensue.

### Intent that the Dog be a Dangerous Weapon

Of course, this does not end the analysis. Simply because a person has a dog, even one with dangerous propensities such as an inclination to bite, it does not mean that the owner will be subject to criminal liability, should the dog injure someone. We will say more about that below. As a prerequisite to the legislatively imposed duty to "handle," there must be evidence that the dog was used or intended to be used by the owner as a dangerous weapon. This is evident from the plain meaning of the statute which requires that the dog be a

"dangerous weapon." A dangerous weapon is defined by § 939.22(10), STATS., in pertinent part as follows:

"Dangerous weapon" means any . . . device or instrumentality which, in the manner *it is used* or *intended to be used,* is calculated or likely to produce death or great bodily harm. [Emphasis added.]

We read this statute to say that a person must use or intend to use an instrumentality in a "manner" which is "calculated" or "likely" to produce death or great bodily harm. In other words, there is an element of scienter present—a person must intend to use an instrumentality as a dangerous weapon. Thus, before the statute can apply here, there must be evidence that Bodoh intended his Rottweilers to be dangerous weapons. Bodoh contends that there is no such evidence. He asserts that there is no testimony from which a trier of fact could conclude that the dogs were intended to be anything other than pets. He points to the testimony of an officer who told the jury that Bodoh had disclaimed any identification of the dogs as either attack dogs or watchdogs. Rather, the dogs were his "babies. . . . They were his pets." Bodoh further points out that there was no testimony that he trained them to attack or to aid in perpetrating an intentional crime. Moreover, the dogs' veterinarian and others testified that the dogs were well behaved and had good dispositions.

But while there is no evidence that Bodoh trained his dogs to attack, there is evidence that he intended to use the dogs as dangerous weapons. The State presented a letter written to law enforcement and signed by Bodoh before the attack occurred. Although there was no testimony about why Bodoh sent the letter, it is undisputed that he wrote it and sent it. The letter stated that he and any of his tenants would coop-

erate with any "government agencies who possess a legal search warrant." Bodoh's letter then explained that "there will be no need for undue force, battering rams, or any kind of forced entry." He also wrote: "There will be no necessity to shoot and kill any watchdogs that may be on the premises at that time. They will be housed in a chain-link kennel." From this letter, a jury could infer that Bodoh meant to use the dogs as watchdogs.

The State also presented testimony of June Ashford, a dog trainer and an owner of Rottweilers, as an expert witness. She testified that Rottweilers are powerful and easily trained. They are considered a "dominant" and "confident" breed. They are becoming popular because they are being purchased and trained for intimidation and attack purposes and as watchdogs. Ashford gave the following opinion: "There are a lot of our breeds that will instinctively bark and maybe move forward, but, generally it does not go beyond the barking and threatening moves." A Rottweiler is one of these breeds. For a Rottweiler to attack a human being "it would not be instinctive . . . . [I]t would either have to be trained or conditioned to that." Rottweilers can be taught to assist persons in positive ways. If the Rottweiler is properly trained as a protection dog, it will be trained not to attack unless given the command. In proper training, the dog will not continually bite. It will bite and hold the "arm" and then back off immediately on command.

But the breed can also be trained or conditioned to react in a negative manner. If the dog is trained or conditioned improperly, the dog can attack indiscriminately—"[i]t can almost be a conditioned response." If the dog is "chasing kids on bikes, or squirrels, or

111

whatever, if you condone it . . . they will continue to do it." It is an "accident waiting to happen."

The jury also heard evidence that Bodoh's watchdogs were for the purpose of guarding Bodoh's motorcyle shop, that the dogs had chased another child and had chased and bitten another dog before this incident.

■

Based on this evidence, a jury could find that Bodoh considered the dogs to be guard dogs or watchdogs, that such dogs are trained to be protective and that attacking is part of the training method. The jury could also find that Rottweilers will not attack unless improperly trained. The jury could also accept the converse as true: that an improperly trained Rottweiler watchdog may attack and bite. The jury could properly draw an inference—based upon this evidence and the evidence that the dogs attacked this boy, chased another boy and attacked and bit a neighbor's dog—that Bodoh improperly trained or conditioned the dogs. The jury could find that this is what occurred here. We are obliged to look for any credible evidence which will uphold the jury's verdict and may not substitute our view of the persuasiveness of the evidence for the jury's view. *See State v. Davidson,* 44 Wis. 2d 177, 200–01, 170 N.W.2d 755, 767 (1969). Therefore, having found that there was sufficient evidence to find that Bodoh intended his dogs to be dangerous weapons but then improperly supervised their conditioning or training, we move to whether there is sufficient evidence that Bodoh's conduct was criminally negligent.

Before we do, however, we issue a disclaimer. We do not know if the State or the district attorney in this case is arguing for a broader or less narrow analysis, but certain statements by the State in its brief and

during oral arguments and statements made by the district attorney during the trial stage seem to imply it. This proposition is as follows: If a dog has attacked or bitten others or has attempted to bite others, and the owner is aware of this, then the owner must treat the dog "as though" it were a dangerous weapon even if the owner does not intend the dog to be so. Said another way, if the owner knows that the dog has a history of being dangerous, then the owner knows the dog is a weapon. If the owner chooses to keep the dog, he or she has a duty to keep the dog under strict observation and control or face exposure to criminal liability.

If that is the theory or one of the theories offered by the State, we reject it, absolutely. The statute requires that a person *use* or *intend to use* an object, animate or inanimate, as a dangerous weapon. Once that intent is expressed, there is a duty to operate or handle that dangerous weapon so as to avoid criminal liability. But a dog does not become a dangerous weapon unless the owner intends the dog to be used as such. If the legislature wanted it to be otherwise—if it wanted dog owners to be criminally liable simply upon knowledge that a dog had vicious propensities—then the legislature could craft a law providing as such. Indeed, the legislature has crafted such a law for situations where a dog kills a human being. That statute is § 940.07, STATS., and provides as follows:

> Whoever knowing the vicious propensities of any animal intentionally allows it to go at large or keeps it without ordinary care, if such animal, while so at large or not confined, kills any human being who has taken all the precautions which the circumstances may permit to avoid such an animal, is guilty of a Class C felony.

The legislature makes dog owners criminally liable for fatal injuries due to a dog attack so long as the owner knows of the dog's vicious propensities. But the only statute on the books regarding nonfatal dog bites where the owner knows of the dog's vicious propensities is the civil statute, § 174.02, STATS. Again, while we cannot say for certain that the State and the district attorney argue in favor of the theory we have just discussed and rejected, the briefs and arguments both on appeal and at the trial stage can be read that way. We want it made clear that we do not accept the theory.[4]

## Criminal Negligence

The final issue before the jury was whether Bodoh's failure to restrain his dogs constituted criminal negligence. Criminal negligence is ordinary negligence to a high degree "consisting of conduct which the actor should realize creates a substantial and unreasonable risk of death or great bodily harm to another." Section 939.25(1), STATS. On this question, the State presented extensive testimony.

The jury heard several witnesses testify about the numerous times Bodoh's dogs had escaped and run

---

[4] We have great respect for the viewpoint expressed in the dissenting opinion. The two opinions, taken together, highlight the differing analyses which can be achieved in this case. We wish to point out, however, that the focal point of our holding is that § 940.24, STATS., requires a person to use or intend to use a dog as a dangerous weapon. Therefore, the dissent incorrectly states that "[u]nder the majority holding, any dog bite circumstances that present a *risk* of great bodily harm to the person bit are criminally actionable against the owner." Dissent at 118. To the contrary, our holding expressly limits criminal liability to owners of dogs who intend their dogs to be dangerous weapons and then improperly handle them as such.

loose. The jury heard the testimony of one witness that her dog had, on two separate occasions, been attacked by one of the Rottweilers. Another witness testified that she and her family no longer walked past Bodoh's property because they were afraid of the dogs. A sheriff's deputy who had spoken to Bodoh after an earlier incident testified that she had been assured by Bodoh that he would take more care to contain his dogs and prevent their running loose. And as we have previously noted, the jury also heard evidence that the dogs had previously attacked another boy, an incident which Bodoh had discounted at the time as being "unlike his dogs, that his dogs [were] usually playful."[5]

Additionally, the jury heard expert testimony about what constituted adequate containment for dogs as large and powerful as Rottweilers. The State's expert, Ashford, testified that a choke chain was not sturdy enough to be an adequate containment method for this breed. She also recommended as an adequate restraint "a chain link fence . . . [with] a concrete bottom on it, because [a Rottweiler] can dig out very quickly, and probably if the dog has had a history of biting, I would also put an outside fence around the inside fence, so that nobody sticks their fingers through or anything else."

---

[5] In his defense, Bodoh offered the testimony of several neighbors who testified that they had never seen the dogs act aggressively and that they were not afraid of Bodoh's dogs. The veterinarian who treated Bodoh's dogs also testified that he had found the dogs to have generally good temperaments and had never had a problem with the dogs at his clinic. However, the veterinarian also testified that "for my own protection, I will not walk up to a Rottweiler, or a Shepherd . . . until I determine what kind of dog it is."

Although the jury heard that Bodoh had staked the bottom of the chain link fence and had placed boards and an electric wire around the base of the enclosure, the jury also saw a photo of a hole where the dogs had dug under the fence and slipped out. While it is not clear how the dogs escaped this particular time, that is immaterial.

Bodoh complains that he took positive steps to reinforce the dogs' enclosure after the previous incidents and at oral argument asserted that the State's theory on criminal negligence was tantamount to a strict liability claim. He asserts that under the State's view, no matter what an owner does to contain an animal, if it gets loose and harms a person, the owner will be liable.

Despite the positive steps that Bodoh took to reinforce the enclosure, the jury could reasonably infer, based on the evidence, that Bodoh's efforts to restrain these animals were wholly inadequate. There was credible evidence to sustain the verdict.

*By the Court.*—Judgment affirmed.

SNYDER, P.J. *(dissenting).* I respectfully dissent from the majority conclusion that present Wisconsin law allows a dog owner to be convicted of a felony if the dog injures a person. It is the legislature's prerogative to create a statutory crime. Not only does Bodoh stand convicted of a crime unknown to Wisconsin law, but public policy is not served by the application of a criminal negligence statute, § 940.24, STATS., to Wisconsin dog owners where the legislature has provided penal-

ties and a civil remedy for such acts under § 174.02, STATS.[1]

There are literally thousands of dogs and dog owners in the state.[2] Under the majority analysis, each of these dogs is considered a "dangerous weapon" and § 940.24, STATS., authorizes the issuance of a felony criminal complaint against any dog owner whose dog is running free without the owner's knowledge and causes bodily harm to a human being. Contrary to the majority holding, the State is not required to establish or prove that the dog was a guard dog, a watchdog, a dog used for protection purposes or a dog of a certain

---

[1] Section 174.02(1), STATS., places liability on owners for "damages caused by the dog injuring or causing injury to a person, domestic animal or property." It also contains a penalty section and a provision permitting the destruction of a dog if the court finds: (1) the dog caused injury to a person or domestic animal "on 2 separate occasions off the owner's property, without reasonable cause," and (2) owner scienter. See § 174.02(3). This statutory section is included in ch. 174, STATS., which pertains entirely to the licensing and regulation of dogs. The majority opinion renders the plain language of § 174.02 superfluous, while concluding that the State may impose criminal liability on dog owners under a statutory section that refers only to criminal negligence in the handling of a "dangerous weapon."

[2] In 1997 there were 27,224 licensed dogs in Milwaukee County and 19,667 licensed dogs in Waukesha County according to the respective county clerks' offices—a total of 46,891 licensed dogs in those two counties. On January 1, 1996, the human population of these same counties was estimated to be 1,297,980 people, or 25.2% of Wisconsin's total estimated population of 5,142,999. See STATE OF WISCONSIN BLUE BOOK, at 734, 740 & 762 (1997–98). Extrapolating these numbers suggests that there is a population of approximately 187,000 *licensed* dogs in Wisconsin, each one exposing its owner to a potential felony prosecution if it gets loose and bites someone.

![black bars]

breed not properly trained in order to file a § 940.24 complaint. Proof of the first element of "Injury by negligent handling of [a] dangerous weapon" merely requires that the defendant operated or handled "any . . . device or instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm." Section 939.22(10), STATS.; see WIS J I—CRIMINAL 1260. Under the majority's interpretation of *Sinks*, that case has determined that a dog satisfies this definition. *Sinks* did not require proof as to the training or type of dog; instead, the *Sinks* court noted that "it is . . . the nature of the act that determines whether [the dog] is a dangerous weapon." *State v. Sinks,* 168 Wis. 2d 245, 254, 483 N.W.2d 286, 290 (Ct. App. 1992); see majority op. at 107. As conceded in the first sentence of the majority opinion, "[t]his is a dog bite case." It then becomes clear that this is a dog bite case that exposes a dog owner to a felony conviction for the physical pain or injury caused to the person bitten. Under the majority holding, any dog bite circumstances that present a *risk* of great bodily harm to the person bitten are criminally actionable against the owner.[3]

My colleagues are correct that dog owners are already criminally liable under § 940.07, STATS., for fatal injuries due to a dog attack if the owner knows of the dog's vicious propensities. However, their analysis of this section does not go far enough. Section 940.07 requires more than the owner's knowledge of the dog's

---

[3] The majority attempts to narrow its holding when it states that there must be evidence that Bodoh "intended his Rottweilers to be dangerous weapons." Majority op. at 110. Yet in the same section, the majority recognizes that "[t]he jury could also find that Rottweilers will not attack unless improperly trained." Majority op. at 112.

dangerous propensities for liability to attach. It authorizes a prosecution only if the dog owner "knowing the vicious propensities of [the dog] *intentionally allows it to go at large or keeps it without ordinary care*, if [the dog], while so at large or not confined, kills any human being." *Id.* (emphasis added.) Additionally, this section places a duty upon the deceased victim to have "taken all the precautions which the circumstances may permit to avoid [the dog]." *Id.* This legislative requirement is not addressed by the majority when it concludes that § 940.24, STATS., extends the State's authority to criminally charge the owners of dogs that bite and cause injury.

Section 940.07, STATS., which addresses an owner's criminal liability for a dog which causes fatal injuries, precludes by its very existence the criminal prosecution of dog owners for dogs causing injury to another. Here, if Bodoh's dogs had caused death rather than bodily injury, the facts of this case would not have supported a criminal prosecution. To put this court's imprimatur on criminal prosecutions for negligent *injury* by a dog where the legislature has precluded criminal prosecution for a *homicide* under the same facts is absurd.

*Sinks,* which was relied upon by the trial court in its determination that a § 940.24, STATS., cause of action exists under the Bodoh facts, is not a criminal negligence case. While the *Sinks* court stated without qualification that "a dog can be a dangerous weapon," *Sinks,* 168 Wis. 2d at 254, 483 N.W.2d at 290, it did not hold that a dog *is* a dangerous weapon. In *Sinks,* the defendant was charged with first-degree sexual assault, which requires that the assault be committed by "*use or threat of use* of a dangerous weapon." *See* § 940.225(1)(b), STATS. (emphasis added). Thus, a

showing that Sinks actively used and controlled his dog was a necessary element of the crime. Bodoh's argument that *Sinks* is distinguishable from his case has substantial merit. *Sinks* does not support the charges against Bodoh; it is inapposite.

Finally, and importantly, when the legislature created § 940.07, STATS., it could have created a companion negligent injury by animal statute. It did not. This court has no right or authority to surmise that the legislature would have created a statute inconsistent with the statutory scheme of §§ 940.07 and 940.08, STATS., in which criminal culpability for homicide due to the knowing and intentional handling of animals (dogs) is distinguished from the culpability required for the negligent handling of inanimate objects (guns, knives, cars, etc.). An owner's criminal culpability for an injury caused by a dog owner's negligence would by logical extension include the proofs and protections provided for in § 940.07.

Where the legislature has created a separate statute for homicide resulting from negligent control of a vicious animal, *see* § 940.07, STATS., but did not create a separate negligent injury statute, it is presumptuous for this court to fill a perceived legislative void. Because I conclude that the majority opinion affirms a felony conviction for a crime unknown in Wisconsin law, and because I discern that existing legislative intent is that animal injury matters be addressed under § 174.02, STATS., I dissent.