Scott A. LAWSON, Plaintiff–Appellant,

v.

Dale TROWBRIDGE, Wendell Howland, and Lee Robarge, et al., Defendants–Appellees.

No. 97–3235.

United States Court of Appeals, Seventh Circuit.

Argued March 30, 1998.

Decided July 28, 1998.

his arrest, and that while in custody government officials provided him with no medical care for his disease, and further aggravated his condition by placing him in solitary confinement for long periods of time. Eventually the state dismissed any charges against Lawson, who then filed suit under 42 U.S.C. § 1983 against the arresting officer, Wendell Howland, as well as Dale Trowbridge (Monroe County's Sheriff) and Lee Robarge (the head jailor). The district court severed the liability and damages phases of the trial; the jury returned a verdict of no liability in favor of Howland, but found that Robarge and Trowbridge had violated Lawson's constitutional rights. The jury then awarded Lawson only $2 in damages, apparently on the belief that the defendants were personally responsible for any damages awarded. Lawson appeals the jury's verdict, which we affirm with respect to Howland, but reverse for a new trial with respect to damages against Robarge and Trowbridge.

Michael J. Devanie (argued), La Crosse, WI, for Plaintiff–Appellant.

Thomas J. Misfeldt, Beverly Wickstrom (argued), Misfeldt, Stark, Richie, Wickstrom & Wachs, Eau Claire, WI, for Trowbridge and Robarge.

Thomas J. Misfeldt, Misfeldt, Stark, Richie, Wickstrom & Wachs, Eau Claire, WI, Raymond G. Clausen (argued), Law Offices of Stilp & Cotton, Madison, WI, for Howland.

Thomas J. Misfeldt, Misfeldt, Stark, Richie, Wickstrom & Wachs, Eau Claire, WI, for Monroe County Prosecutor's Office.

Before MANION, ROVNER, and EVANS, Circuit Judges.

MANION, Circuit Judge.

Scott Lawson, who suffers from schizophrenia, was arrested in Sparta, Wisconsin for carrying a concealed weapon, specifically, a fishing knife with a 6–inch blade. Because he had no money and could not post a cash bond, he remained in custody for ten months. He claims there was no probable cause for

I.

Scott Lawson already was down on his luck when he set out to hitchhike across the state of Wisconsin in November 1993. Apparently he was headed to his parents' home in Appleton for Thanksgiving, but he took a detour through Sparta because he had heard he could get a job there as a third-shift cook in a restaurant. By the time he arrived, the job was gone. He was unable to hitch a ride out of town, so in Sparta he stayed. Other than his checkbook, Lawson had only spare change and a $50.00 savings bond, which he unsuccessfully tried to cash in town at Side Kicks Tavern. Though the owner couldn't cash his check, he did buy Lawson a beer. But the bar became a less friendly place once Lawson started to ask strange questions—such as: Did the bar have a back door? Did it open inward or outward? Was it kept locked? And: How much money is needed to operate the jukebox and the video games in the bar? In addition, the bartender testified at trial that Lawson seemed to scrutinize her activity whenever she operated the cash register.

That was enough to prompt someone to tell the Sparta Police Department (directly across the street from Side Kicks) that a man was acting strangely in the bar. Officer Howland visited the bar and asked Lawson for identification; Lawson provided his social security card. Howland ran Lawson's name through the police computer, checking for warrants and the like. Lawson passed, and the bartender told Howland it wouldn't be necessary to throw Lawson out. Later that evening, Howland spotted the manager of Side Kicks in a laundromat and asked him whether he knew Lawson. The manager replied no, but added as an afterthought that Howland should be careful if he ran into Lawson again because Lawson had a knife under his coat. That prompted Howland's return to the bar to wait for Lawson to leave (Howland did not want to put anyone at risk in the bar by confronting Lawson there). Shortly after leaving the bar, Lawson was stopped by Howland, who confirmed that Lawson indeed possessed a fishing knife (with a leather sheath and a cord bearing a metal clip). The knife contained a thin, fixed blade approximately 6 inches long; it came to a narrow point. Lawson used the cord to suspend the knife over his left breast; the knife was completely concealed under Lawson's coat. After examining the knife, Howland arrested Lawson for carrying a concealed weapon, and at the trial he explained why:

> It was the ... totality of the circumstances; the positioning of the knife in a vertical fashion for quick withdrawal, the fact that he was carrying it concealed when he could have put it in his duffel bags if he was worried about losing it as he testified himself earlier, the fact that he was asking questions in a bar that might lead somebody to suspect that he may be thinking of a burglary or a robbery, the fact that he had no money.

The knife was not Lawson's only problem. Once the police searched his bags at the stationhouse, they found a variety of tools, including screwdrivers, wrenches, and a multimeter. According to the government, Lawson told the booking officer he had no permanent address, a fact which may have swayed the district attorney to press charges against

him. But Lawson claims that he had a permanent residence in Verona, Wisconsin, and that Howland knew this based on his computer checks. Whether Howland knew Lawson's address is immaterial; what is important is that the district attorney charged Lawson with one misdemeanor (carrying a concealed weapon) and one felony (possession of burglarious tools).

It was only the beginning for Lawson because he did not have the $500 he needed to post bond. He received monthly disability payments from the Veterans Administration (he was disabled veteran because of his schizophrenia), but he used that money to pay his rent. So, on November 19, 1993, he was put in jail (with only ten cents on him). He also had two bottles of Symmetrel, used (along with Prolixin) to treat his disease. One of the defendants, Lee Robarge (the jail administrator) testified that he was aware one of Lawson's acquaintances had called the jail to notify the authorities that Lawson was a schizophrenic who needed medication. Robarge and Trowbridge do not mention this fact in their briefs; their Statement of Facts instead assures us that Lawson *himself* "never told the Monroe County jail staff" that he was schizophrenic and needed psychotropic drugs. Presenting favorably incomplete facts is unhelpful to our review and contrary to our rules. *See* Circuit Rule 28(d)(1) (stating that a party's Statement of Facts "shall be a fair summary" of the case); *see also Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1224 (7th Cir.1995) ("A misleading statement of facts increases the opponent's work, our work, and the risk of error."). In addition, they include in their factual summary "facts" that were contested at trial. Our rules are "designed to make appellate briefs as valuable an aid to the decisional process as they can be," *Avitia, id.* The defendants' brief not only caused delay but could have caused a misstep. Along with this opinion we therefore issue to Robarge and Trowbridge's attorneys a rule to show cause why they should not be sanctioned under Circuit Rule 38 for failing to comply with Rule 28(d)(1). Their response is due within 14 days of this opinion.

We return to the facts. Between his arrest on November 19, 1993 and March 3, 1994, Lawson was held in solitary confinement for at least 65 days. The parties do not tell us why. Lawson then spent three months in a state hospital for mental examination; he was held there until restored to competency in June. Eventually Lawson pleaded guilty and was sentenced to ten years' conditional release, but the conviction was thrown out on appeal. On remand, the state dismissed its charges against him. Lawson finally was released from prison on September 19, 1994, exactly 10 months after Howland arrested him for carrying a concealed weapon. Shortly thereafter he filed this action under § 1983 alleging violations of his constitutional rights relating to the manner of his arrest and incarceration. Lawson sued Howland for making an arrest without probable cause, false imprisonment, and malicious prosecution. He also sued Trowbridge and Robarge, alleging they were recklessly indifferent to his serious medical needs and unconstitutionally punished him by placing him in solitary confinement (thereby violating his procedural due process). As noted above, the jury returned a verdict of no liability with respect to Howland. The jury found Robarge liable with respect to both claims against him; it found Trowbridge liable only with respect to the claim relating to Lawson's solitary confinement. But after finding liability, the jury awarded him only $2 in damages ($1 with respect to Robarge and Trowbridge, each).

## II.

On appeal Lawson claims the district court committed several errors entitling him to a new trial. As to defendant Howland, Lawson claims that one of the district court's instructions (defining "dangerous weapon" under Wisconsin law) misled the jury into believing that it could find Lawson's fishing knife to be inherently dangerous without regard to Lawson's intent in carrying it. According to Lawson, this impression was inappropriately reinforced by expert testimony which should have been kept out of the trial. As to Trowbridge and Robarge, Lawson seeks a new trial because the district court made two errors. The first involved a "miti-gation" instruction which inappropriately left the jury with the understanding that Lawson's damages must be reduced if it found Lawson could have avoided further injury simply by posting bond. The second occurred when the district court allowed Trowbridge and Robarge—without cross-examination-to imply that they were personally liable for any damages awarded to Lawson (when in fact a Wisconsin indemnification statute provides that the state typically picks up the tab).

■ We first tackle the government's argument that Lawson waived any objection to the court's definition of "dangerous weapon" in its instruction to the jury. See Fed. R.Civ.P. 51 (in order to preserve an appeal of an erroneous jury instruction, the complainant must "object[ ] thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection"). The record reveals that on more than one occasion Lawson's attorney informed the district court that he could not live with the court's definition of "dangerous weapon" because (he believed) it misled the jury into believing Lawson's fishing knife was inherently dangerous. The district court understood the objection and at one point even asked the attorney to stop—"You've made your record. That's been the focal point of this trial since we discussed it somewhere around final pretrial conference time. I understand your concerns. I understand the appropriate arguments that you probably will be making. I don't find any ... authority for the doctoring of the instruction." Based on this exchange and several others in the record, we find that Lawson properly preserved his objection to the jury instruction. After a district court judge tells a litigant that he has made a sufficient record on a point, it is understandable that a litigant would want to avoid irritating the judge by restating the objection for appellate purposes. Cf. Dawson v. New York Life Ins. Co., 135 F.3d 1158, 1165 (7th Cir.1998) ("[I]f the district court judge assured the parties that the record adequately contains their objections, the parties should not be penalized for relying on such assurances, although the more prudent practice is

to restate in exacting language the precise objections and the reasons therefor.").

■ This means that we can consider the precise problem Lawson has with the jury instruction, while at the same time noting that his hurdle on appeal is a high one. When reviewing the substance of jury instructions, our task is to determine "if the instructions as a whole were sufficient to inform the jury correctly of the applicable law. Reversal is warranted only if the instruction misguides the jury so much that a litigant is prejudiced." *Maltby v. Winston*, 36 F.3d 548, 560 (7th Cir.1994). Lawson's first line of attack is that the district court's instructions failed to properly define the term "dangerous weapon," leaving the jury to speculate about its exact meaning (and presumably find that Howland had probable cause to arrest Lawson). The court instructed the jury in the following manner:

> The first element of this offense [carrying a concealed weapon] requires that the plaintiff went armed with a dangerous weapon. The phrase 'went armed' means that the weapon must have been either on the plaintiff's person or that the weapon must have been within the plaintiff's reach. The first element also requires that the weapon be dangerous. The Criminal Code provides that a dangerous weapon means any device designed as a weapon and capable of producing death or great bodily harm or any other device or instrumentality which in the manner it is used or intended to be used is calculated or likely to produce death or great bodily harm.

We have remanded cases for new trials when jury instructions are hopelessly unhelpful, as Lawson suggests this one is. In *Dawson*, New York Life Insurance appealed a jury verdict in favor of a former branch manager, who had sued the insurance company for recklessly making defamatory comments about him. The district court's instruction did little to tell the jury what it meant to exhibit a "reckless disregard" for the truth: "reckless disregard for [Dawson's] rights and the consequences that might re-

sult to him means that New York Life engaged in any reckless act that shows a disregard for his rights." 135 F.3d at 1167. We concluded that this definition was circular (doing little more than asserting that "reckless disregard" means "reckless disregard"), and that the lack of a helpful instruction meant the jury "flew blind during its deliberations and judged all the statements at issue without the necessary legal guidance." *Id.* Even though the faulty instruction was one of dozens that were "hotly debated" by the parties, we ordered a new trial because "recklessness was the yardstick by which the jury was to measure New York Life's behavior." *Id.*

■ The problem for Lawson is that even if we agreed that "dangerous weapon" is a "term of art," *id.*, or, as he puts it, an "enigmatic term," we would not agree that the district court's instruction was incorrect or misinformed the jury. It is largely taken from Wisconsin's Criminal Code (Section 939.22(10)), omitting only that part of the statute that describes firearms and electric devices (neither category of which is at play in this case) also to be "dangerous weapons." The instruction might have come close to the circularity detailed in *Dawson* if it had stopped short by merely stating that the crime of concealing a dangerous weapon "requires that the weapon be dangerous." But it does not stop there; instead, it goes on to specify two specific circumstances in which a device may be considered dangerous: (1) if it is designed as a weapon and capable of producing death or great bodily harm; or (2) if it is a device or instrumentality which, in the manner it is used or intended to be used, is likely to produce death or great bodily harm. While Lawson claims that the jury engaged in sheer speculation concerning what constituted a dangerous weapon, there was no reason for the jury to speculate given the court's instruction.

■ Lawson's real concern is that the first half of the court's instruction—that a device "designed" as a weapon is per se "dangerous"[1] appears to be inapplicable to

---

1. According to Lawson and the statute's commentary, brass knuckles and blackjacks would qualify.

this case because no one argued at trial that Lawson's knife fell into this category. Lawson speculates that because the jury found against him, it must have used this part of the instruction in reaching its verdict. Of course this is wrong, because the jury instruction made it clear that Lawson's knife could be dangerous in one of *two* ways, and the jury may well have relied upon the second. At most the first half of the instruction should not have been given because (as the government conceded at argument) it told the jury more than it needed to know. But we do not throw out jury verdicts simply because one instruction—that correctly states the law—should not have been given. To the contrary, "[w]hen an instruction is given to which no evidence corresponds, the likely consequence is that the jury ignored it. The error in giving it is therefore presumed to have been harmless." *S.A. Healy Co. v. Milwaukee Metropolitan Sewerage District,* 50 F.3d 476, 481 (7th Cir.1995) (citing *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1225–26 (7th Cir.1995) and *United States v. Cartwright,* 6 F.3d 294, 301 (5th Cir.1993)). Of course the presumption could be rebutted, *S.A. Healy, id.,* but because Lawson's briefs neither acknowledged the possibility of harmless error nor cited the cases above containing the principle, we have no difficulty finding it was not rebutted here.

Lawson makes one additional argument on the instruction. He claims that the jury's verdict cannot stand even if the jury properly relied upon the second half of the instruction (defining dangerous weapon as a device which, "in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm"). Lawson apparently bases this conclusion on Officer Howland's trial testimony to the effect that (prior to his approaching Lawson) he had no reason to believe that Lawson intended to cause anyone death or great bodily harm. Lawson trumpeted this concession at oral argument, contending that this proves Howland had no probable cause to make an arrest for carrying a concealed (dangerous) weapon.

■ Not so. Howland's "concession" is consistent with the jury's verdict that he had probable cause. Under Wisconsin law (as reflected in the jury instruction), an arresting officer need not believe a suspect actually intends to use his weapon. The officer need only believe the defendant has used the device—or would use it—*in a manner* likely to produce death or great bodily harm. In other words, the issue is *how* the officer believes the defendant would use the device whether or not the defendant actually intends to use it at all. Any doubt on this point was resolved by a decision of the Wisconsin Court of Appeals in *Wisconsin v. Bodoh,* 582 N.W.2d 440 (Wis.App.1998). In that case, defendant Jene Bodoh's Rottweilers escaped from a fenced enclosure and attacked a 14–year–old boy on a bicycle. A jury convicted Bodoh of negligent handling of a dangerous weapon (his dogs), that type of weapon being defined in the same way it's used in this case. Bodoh argued on appeal that he never intended for his dogs to attack the boy, a point obviously conceded by everyone. But his argument missed the point, because the evidence revealed Bodoh meant to use his dogs as watchdogs capable of attacking. According to the court, this meant the dogs were dangerous weapons whether or not they actually ever had to defend Bodoh by inflicting injury on others. "We read [Wisconsin law] to say that a person must use or intend to use an instrumentality in a 'manner' which is 'calculated' or 'likely' to produce death or great bodily harm." *Bodoh,* 582 N.W.2d at 444. Therefore, it is irrelevant whether a person actually intended to *use* the "dangerous" weapon; the only "element of scienter present [is that] a person must intend to use an instrumentality *as* a dangerous weapon." *Id.* (emphasis added). In other words, it was sufficient that Bodoh "intended his Rottweilers *to be* dangerous weapons." *Id.* (emphasis added). Similarly, Officer Howland could not read Lawson's mind, but a jury reasonably concluded that Howland had cause to believe Lawson intended his knife *to be* a dangerous weapon, making it off-the-point here (as in *Bodoh*) whether Howland actually believed Lawson intended to take the extra step and put the knife to use.[2]

2. This explains why Wisconsin courts have rec- ognized that seemingly benign objects (both ani-

■ So the only real issue is whether Howland had probable cause to believe that *the manner* in which Lawson would have used the knife was likely to cause death or great bodily harm. (Again Lawson misses the point by arguing that he never intended to harm anyone; the issue is whether the manner of the intended use "was likely" to cause serious harm.) For the reasons stated above, we find that the district court's instruction accurately reflected this legal standard. Lawson stops there; he does not go on to argue that even if the jury was properly instructed, it could not reasonably have found Howland had probable cause to make an arrest. But by way of completeness, we note that Lawson was wise not to push on. Howland first met Lawson in a bar, late at night, acting—according to the bartender—strangely. Lawson apparently watched the bartender whenever she tended the till and asked questions certain to raise an eyebrow—such as whether the back door opened in or out. In addition, Lawson generally seemed out of place. He sat alone, with no money (the owner bought him a beer), and carried duffel bags. He left on foot. And when Howland encountered Lawson later on the street, the officer noticed Lawson kept his knife concealed. The vertical positioning of the knife allowed for quick access. Based on these circumstances, Howland concluded that Lawson might well be planning a robbery or burglary, and that Lawson's knife would help get the job done either by way of protecting him or threatening others. A burglary obviously would endanger the life and limb of others (as well as Lawson's own) if he went about it armed with a six-inch knife. In short, Howland was faced with a decision to arrest on-the-spot, late at night, while confronting an unknown individual with little identification, strange behavior, and a large knife. We cannot say that the jury's verdict in favor of Howland was unreasonable, or,

more particularly, that Howland's hunch about Lawson was improbable. (And although we must not confuse hindsight with foresight, we note that the district attorney went on to charge Lawson with one count of carrying burglarious tools.)

Lawson revives the issue by also arguing that the *combination* of the district court's "dangerous weapon" instruction and expert testimony admitted at trial (concerning Howland's police training) created the impression that a knife is an inherently dangerous weapon regardless of the circumstances at play. The argument gets him nowhere given our conclusion that the court properly instructed the jury. But we have reviewed the testimony in question anyway to see if the court abused its discretion in letting it in. *Maltby,* 36 F.3d at 564. Expert testimony is admissible where it may be helpful to the jury. Fed.R.Evid. 702. In this case, the testimony comes from Officers Noe and Marcou. Noe taught Howland in a four-hour course on defense and arrest tactics at the Sparta Police Department. Marcou taught Howland in basic training in 1986. Their testimony was not scientific—either in a hard or soft (social science) way—and it was entirely descriptive rather than based on empirical study of any sort (where the so-called *Daubert* test would be more helpful, particularly in distinguishing between "real science or junk (courtroom) science." *United States v. Williams,* 81 F.3d 1434, 1441–42 (7th Cir.1996) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993))). What made them experts in the district court's eyes was that Noe and Marcou had specialized knowledge concerning police training, specifically, how police officers such as Howland are trained to approach knives in varying contexts.

■ Both Noe and Marcou testified that knives are dangerous; Noe added that he

---

mate and inanimate), such as dogs and glass bottles, can be "dangerous weapons" under the statute once they are used (or intended to be used) in violent ways. *See Langston v. State,* 61 Wis.2d 288, 212 N.W.2d 113, 115 (1973) ("It was within the province of the jury to determine whether a [Coke] bottle of this nature, used *in the manner in which it was,* striking the driver on the temple, could be calculated or likely to produce

great bodily harm") (emphasis added); *State v. Sinks,* 168 Wis.2d 245, 483 N.W.2d 286, 290 (1992) (finding defendant "used or threatened the use of his dog [a doberman pinscher] *in such a manner* that the dog constituted a dangerous weapon" by containing the victim so that the defendant could sexually assault her) (emphasis added).

taught Howland to arrest individuals (via a high-risk felony takedown) carrying concealed weapons in bars. Why? Because alcohol and knives don't mix well. Noe told the jurors that bar fights are common and that anything available (a pool cue, knife, etc.) is likely to be used as a weapon. The jurors may have suspected the same, but that doesn't make his testimony unhelpful. In the same way, Marcou testified that a criminal on the street often uses a knife as his weapon of choice (especially against a law enforcement officer) "because it's silent, it's easily concealable, it's usually looked upon as less criminal in nature than [a] gun so you'll get less of a penalty for carrying it." And a practical point—a knife "never runs out of ammunition so it's going to be there."

■ The district court did not abuse its discretion in admitting this testimony. To be sure, none of it is earth-shattering, and Lawson is correct that portions probably overlapped with the jurors' own experiences. No matter. A trial court "is not compelled to exclude [an] expert just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension." *United States v. Hall,* 93 F.3d 1337, 1342 (7th Cir.1996). "All you need to be an expert witness is a body of specialized knowledge that can be helpful to the jury." *Williams,* 81 F.3d at 1441 (7th Cir.1996). Knowledge of police training is specialized, and at the very least it places Howland's actions into context. It explains why he was concerned enough about a report that Lawson was wearing a concealed knife to return to the vicinity of the bar, and to wait until Lawson left the bar so as to avoid any confrontation inside, where innocent bystanders could fall into harm's way. Contrary to Lawson's suggestion, the testimony did not tell the jury that knives are inherently dangerous in all circumstances. Both Noe and Marcou noted that context is important; concealed knives carried by deer hunters in the Wisconsin wild are not approached in the same way (or at all) as knives hidden on bar patrons. Noe and Marcou had enough experience in the field to explain why concealed knives in (or immediately outside) bars can be lethal, and why officers such as Howland should take seriously a report that the same

person who previously asked a bartender suspicious questions has left the bar on foot with a concealed fixed-blade knife.

Though it is not dispositive of our treatment of the issue, we note that Lawson's attorney never cross-examined Noe on any of these points. That might have been the time to clarify that Noe had no authority or expertise to do what Lawson accuses him of doing—implying that a knife is inherently dangerous regardless of the circumstances. But as we say, neither Noe nor Marcou ever testified in that way. In short, whether we evaluate the impact of their testimony in combination with the district court's jury instructions, or apart from them, we find no reason to upset the jury's verdict that under the Fourth Amendment Officer Howland had probable cause to arrest Lawson for violating Wisconsin law by carrying a concealed—and dangerous—weapon.

## III.

Lawson also appeals the jury's decision to award him only $2 in damages after finding that defendants Trowbridge (Sparta's Sheriff) and Robarge (the head jailor) violated his constitutional rights. Lawson attributes the nominal damages award to two errors on the district court's part—first, by instructing the jury that all persons injured (including Lawson, obviously) have a duty to use reasonable means to prevent the aggravation of their injuries, and, second, by allowing the defendants to imply without cross-examination that they would be personally responsible for any award of damages issued against them.

■ The district court instructed the jury that Lawson had a duty to mitigate his damages: "It is the duty of any person who has been injured to use reasonable means under the circumstances in order to prevent the aggravation of such injuries and to effect a recovery from such injuries." Nothing about the instruction itself is objectionable. A Section 1983 claim is "a species of tort liability," *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 2370, 129 L.Ed.2d 383 (1994), and we have described the entire law as "a tort statute." *Doe v. Welborn,* 110 F.3d 520, 523 (7th Cir.1997). So it makes sense that the

government wanted the jury instructed on the doctrine of mitigation, or avoidable consequences. The doctrine is simple: "when a tort victim fails to take reasonable steps to mitigate his damages, those damages are either cut down or eliminated altogether under the principle of 'avoidable consequences.'" *Brooks v. Allison Div. of Gen'l Motors Corp.*, 874 F.2d 489, 490 (7th Cir.1989). For a more recent discussion of a tort victim's duty to "minimize the harm" after the tort has occurred, see *Outboard Marine Corp. v. Babcock Industries, Inc.*, 106 F.3d 182, 184 (7th Cir.1997). An obvious example would be a person who, when cut by a defective product, fails to take antiseptic measures, thereby allowing the wound to become infected. The injured person may recover damages from the tortfeasor, but only for the harm that he would have suffered had he exercised reasonable care.

At trial, the government aggressively pursued the theory that Lawson failed to help himself by posting the $500 bond, causing him to linger in jail for an extraordinary length of time (10 months). The defendants' attorney cross-examined Lawson on this theory, asking him whether he knew that posting the bond would have enabled him to stand up as an usher at his brother's wedding, to attend the funeral of his favorite uncle, to make it home for Thanksgiving, and so on. He could have asked his mother for the money, or his brothers William and Steve, or his sisters Shawn and Kelly, or his step-father. What about all of these people, the government asked him. Lawson responded that he was uncomfortable asking others to bail him out (literally)—in his words, "if you make a mess you clean it up." Still, the defendants' attorney pressed on, pointing out that Lawson at least could have applied his VA disability check (which he used to cover his rent) to pay the bond:

Q. You thought paying the rent was more important than getting out for Thanksgiving or your brother's wedding?

A. That's correct.

Q. You thought paying the rent was more important than—

A. I—

Q. —getting out for your dead uncle's funeral or for Christmas?

A. I didn't think it was more important. I had committed that money so that my stuff, my belongings would not be put out on the street and taken away by whoever evicted me from the apartment that I had a lease agreement for.

Finally, in her closing argument, the attorney made sure the jury understood the defendants' mitigation theory: "[Lawson] wasn't stuck in that jail. He wasn't stuck in that holding cell. He could have gone any time he wanted to and simply had to make the decision to make a payment that the judge told him he could make and then he could move on."

The avoidance of consequences doctrine has legitimate application in tort cases (*see, e.g., Burlington Industries, Inc. v. Ellerth*, — U.S. ——, ——, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998) ("Title VII borrows from tort law the avoidable consequences doctrine")), and perhaps even in a case like this one. In a sense the defendants' theory was that Lawson could have asked for assistance to prevent the aggravation of his injuries (this assumes, as we discuss later, that his schizophrenia would have allowed him to do that). It is a bit different to impose a duty on a tort victim to elicit the aid of others than it is to question whether the victim on his own took reasonable steps to avoid further injury. There is no guarantee Lawson's family would have come to his rescue even if asked.

Lawson's approach is a bit different—he argues that he had no duty to mitigate because his injuries (lack of medical care and solitary confinement) had not yet occurred. But in fact they *had* occurred; they simply were not *complete* until the state dropped its charges and released him from jail. While the doctrine of avoidable consequences does not require a victim to avoid the injury in the first place (though other tort doctrines might), *Miller v. Lovett*, 879 F.2d 1066, 1071 (2d Cir.1989), in the case of an ongoing tort like this one neither does it mean that he has no duty to assist himself until the tortfeasor has completely ceased his tortious activity.

Speaking of assisting oneself, we are aware of only one other case—not cited by the parties-wherein a court of appeals faced a mitigation instruction similar to the one here. In *Gladden v. Roach,* 864 F.2d 1196, 1200 (5th Cir.1989), a police officer held Richard Gladden in custody for 87 hours before he was arraigned on charges of public intoxication and disorderly conduct. Gladden could have been released earlier by simply posting a $200 bond, but he refused. Two of his friends came to the jail and posted the bond on his behalf, but Gladden turned them away. Gladden sued under § 1983 seeking damages for being detained so long; a jury awarded him $1. On appeal, he argued the district court improperly gave the following mitigation instruction—one much more direct than the one we have in our case:

> You are instructed that any person who claims damages as a result of an alleged wrongful act on the part of another has a duty under the law to mitigate those damages, that is, to take advantage of an opportunity he may have had under the circumstances to reduce or minimize the loss or damage. So, in regard to the plaintiff's arrest and detention . . . , if you should find from a preponderance of the evidence that plaintiff failed to seek out or take advantage of an opportunity to be released from jail . . . including the bail bond tendered by [Gladden's friend] and any opportunity his father may have had to obtain his release, if ye so find, then you should reduce the amount of his damages by the amount of any damages he could have avoided if he had taken advantage of such opportunity.

*Id.* The court rejected Gladden's objection to the instruction and noted that Gladden's duty to mitigate was not absolute, but rather he was simply required to avail himself of reasonable opportunities to help himself.

 There are important differences between our case and Gladden's. Gladden's friends came to the jail and actually posted his bond, which Gladden refused. Here the defendants wanted Lawson to call his family on his own, explain his predicament, and ask for the $500 bond. Or skip his rent and apply all the money he had—his VA check—to the bond so he could get out of jail. More important, unlike Lawson, Gladden was not a schizophrenic who needed-but was not taking—his medication (the defendants blame him for not asking for it). Even if we went along with *Gladden* and generally saw a place for the avoidance of consequences doctrine in a failure-to-post-bond case, we would be uncomfortable with the conclusion these facts present: that a mentally ill man, who (the jury found) was held unconstitutionally in solitary confinement for at least 65 days, *and* (the jury found) was not provided medical care for his disease, *and* spent three months of his confinement in a state mental hospital because he was adjudged to be incompetent to stand trial, acted unreasonably by not applying his VA check (used for rent money) toward his bond and not asking his family members to bail him out. Whether jury instructions infused with common law doctrines such as avoidance of consequences have a place in suits involving the deprivation of constitutional rights is another question, also difficult. This much is certain—while there may be a case wherein the mitigation instruction used here has a place, this isn't the one. We have found no other court (probably for good reason) requiring a defendant to divert committed funds in order to avoid suffering injury at the hands of his jailors. Creating a bigger crisis (eviction) by solving the immediate one is not an opportunity for mitigation, even if we did not factor in Lawson's conceded mental illness.

If the erroneous instruction alone would not warrant a new trial, another reason weighs in favor of it. The defendants gave the jury the erroneous impression that they were personally responsible for any damages awarded, and the district court rejected any attempt by Lawson to challenge that impression on cross-examination. The direct testimony of Robarge and Trowbridge during the liability phase of the trial was devoted almost exclusively to documenting their respective limited net worths. In fact, the record reveals Trowbridge's attorney asked him nine questions on direct examination; *all* of the questions concerned Trowbridge's salary, the mortgage remaining on his house, his assets (two vehicles), and his debts (credit cards, car payments, etc.). Robarge's testimony fo-

cused on his financial affairs in much the same manner. Leaving no room for ambiguity, the defendants' attorney made it perfectly clear in her closing argument that her clients' finances were at stake:

> They've been doing a good job that very few of us would want to do for very little pay and have accumulated very little assets for all their time in public service. And in making all of your award I ask you to keep in mind that they have received very little compensation for what they have done. *I ask you to keep in mind their situation, their financial situation and to make your award an award that keeps all of that firmly in perspective.*

(emphasis added).

The only reasonable interpretation of this testimony and argument is that Robarge and Trowbridge wanted the jury to know they could not afford to pay Lawson damages for conduct the jury already determined violated Lawson's civil rights. But under Wisconsin law, Robarge and Trowbridge faced no personal responsibility to pay the jury's damages award so long as they were acting within the scope of their employment in their dealings with Lawson.[3] In that case, the judgment would be paid by the state or political subdivision employing the defendants (probably Monroe County here). *See* Wis. Stat. § 895.46 (1997). Lawson brought this statute to the district court's attention, and in short sought to use it in rebuttal to clarify that the defendants were not personally on the hook. But the district court refused, relying upon the general rule that evidence of payments received from collateral sources is inadmissible. *See, e.g., Larez v. Holcomb,* 16 F.3d 1513, 1518 (9th Cir.1994) ("It has long been the rule in our courts that evidence of insurance or other indemnification is not admissible on the issue of damages, and, should any such information reach the ears of the jurors, the court should issue a curative instruction."); *see also Halladay v. Verschoor,* 381 F.2d 100, 112 (8th Cir.1967) ("Unless the fact that the plaintiff is insured or otherwise indemnified is a material issue

in the case, or unless the prejudicial effect has been cured by an admonition or instruction to the jury to disregard it, it has been almost universally held that the receipt of such evidence constitutes prejudicial error sufficient to require reversal.").

█ "We have noted the inappropriateness of allowing the defendant to plead poverty if he will be indemnified"; "such evidence .... is inadmissible." *Kemezy v. Peters,* 79 F.3d 33, 37 (7th Cir.1996). The district court nevertheless allowed Trowbridge and Robarge to highlight their financial circumstance, perhaps because Lawson did not object. The playing field might have been balanced a bit had the court allowed Lawson to introduce the indemnification statute, but the court did not take advantage of that opportunity. Even under the abuse of discretion standard, which we apply in cases of challenged evidentiary matters, *United States v. Payne,* 102 F.3d 289, 294 (7th Cir.1996), we conclude that the district court should not have allowed Trowbridge and Robarge to leave the jury with the wrong impression. In the general case courts exclude evidence of indemnification out of a fear that it will encourage a jury to inflate its damages award because it knows the government—not the individual defendants—is footing the bill. *Larez,* 16 F.3d at 1519. Here the rationale for applying the general rule dissolved once the defendants made their financial weakness the centerpiece of their testimony in the damages phase of the trial. At that point, their direct testimony "opened the door" and the district court should have permitted Lawson to point to Wisconsin's indemnification statute. Along with other courts, we have made this distinction before. *See Brandt v. Vulcan, Inc.,* 30 F.3d 752, 760 (7th Cir.1994) (agreeing with district court that evidence showing injured worker retired with full pension benefits was admissible over collateral source objection to impeach worker's testimony that he retired under disability); *see also Cowens v. Sie-*

---

**3.** The defendants would be indemnified even if the jury awarded punitive damages, which Lawson sought. *See Bell v. City of Milwaukee,* 746 F.2d 1205, 1271 (7th Cir.1984) ("The indemnity afforded governmental employees under Wis. Stat. § 895.46 applies to all 'judgments', no distinctions being made for compensatory damages versus punitive damages.").

*mens–Elema AB*, 837 F.2d 817, 824 (8th Cir.1988) ("While it is true that evidence of payments received from a collateral source is ordinarily inadmissible, we have recognized that a [party's] testimony on direct examination may make evidence of payments from a collateral source relevant and necessary for purposes of rebuttal."); *Kroning v. State Farm Automobile Ins. Co.*, 567 N.W.2d 42, 46 (Minn.1997) (holding that the collateral sources rule should not be used as a shield; accordingly, "when a plaintiff through either the use of misleading statements or outright false statements, falsely conveys to the jury that he or she is destitute or in dire financial straits, the admission of evidence of collateral source payments received by the plaintiff is permitted."); *Hack v. State Farm Mutual Auto. Ins. Co.*, 37 Wis.2d 1, 154 N.W.2d 320, 325 (1967) (stating that evidence may be admitted over a collateral source objection if introduced for purposes of impeaching a witness' credibility).

In this limited circumstance we will set aside the general rule against admitting Lawson's evidence (of a collateral source) because the defendants pleaded severe financial strain. Here, "the scope of permissible inquiry is set by the direct examination and the usual rules of cross-examination apply." *Lange v. Missouri Pacific R. Co.*, 703 F.2d 322, 324 (8th Cir.1983). Even the Federal Rules of Evidence, in generally limiting the subject matter of cross-examination to matters addressed on direct, suggest the two closely track one another. *See* Fed.R.Evid. 611(b). After carefully reviewing the trial transcript, we are left with the conclusion that the defendants' detailed financial testimony opened the door concerning who likely would pay any judgment against them, and the district court abused its discretion in not allowing Lawson to rebut by telling the jury who likely would pay. Given the jury's decision to assess only nominal damages against Trowbridge and Robarge after finding them liable, we conclude the district court's error was not harmless.

Accordingly, we affirm the jury's verdict with respect to Officer Howland, but reverse and remand for a new trial with respect to defendants Trowbridge and Robarge. We leave the jury's verdict on liability intact; the defendants did not cross-appeal on the liability issue, and nothing tells us that the issues of liability and damages are so interwoven that a plaintiff such as Lawson should have to prove his case a second time. *See McClain v. Owens–Corning Fiberglas Corp.*, 139 F.3d 1124, 1128 (7th Cir.1998). The trial on damages should not include the mitigation instruction discussed above. During the new trial the defendants should not stress their personal financial limits; if they do, the district court should reconsider the admission of the Wisconsin indemnification statute. We express no opinion as to whether the statute is inadmissible for other reasons not raised during the trial (e.g., the statute permits indemnification only if the defendants were acting within the scope of their employment). Our decision is based on the district court's erroneous conclusion that the statute is inadmissible in a case like this one, where the defendants have so obviously put their financial well-being—and thus their ability to pay—into play. AFFIRMED in part and REVERSED AND REMANDED in part.